Michelson Land and Home Company v. Commissioner.
Michelson Land & Home Co. v. Commissioner
Docket No. 19523.
United States Tax Court
1949 Tax Ct. Memo LEXIS 88; 8 T.C.M. (CCH) 817; T.C.M. (RIA) 49224; August 31, 1949
J. H. Amick, C.P.A., 209 Majestic Bldg., Detroit, Mich., for the petitioner. Philip J. Wolf, Esq., for the respondent. HARLAN Memorandum Opinion HARLAN, Judge: Respondent determined a deficiency in petitioner's income tax for the fiscal year ended November 30, 1944, in the amount of $2,325.57. The *89 legal questions involved are so dependent upon an understanding of the relevant provisions of the statutory law of Michigan as applied to the facts in this case that we find it impractical to give an effective statement of the questions until after a summary of the applicable statutory law and the facts herein is given. The facts are all stipulated and adopted as stipulated. [The Facts] Petitioner is a Michigan corporation with its principal place of business at 300 Penobscot Building, Detroit, Michigan. Petitioner's return for the taxable year ended November 30, 1944, the taxable year involved in this proceeding, was filed with the collector of internal revenue for the district of Michigan at Detroit, Michigan. In reporting income petitioner files its returns on a cash basis and uses a fiscal year which commences December 1 and ends November 30. As of December 31, 1937, petitioner owned, among other pieces of property, 173 vacant and unimproved lots situated within the State of Michigan. City, state and county taxes were delinquent on all of them. Thereafter, on various dates occurring prior to the beginning of the taxable year here in question, each of these lots was acquired *90 by the State of Michigan for nonpayment of such taxes, by virtue of the provisions of applicable Michigan statutes and law. Under said statutes, petitioner had a right to redeem these properties within the prescribed statutory period of redemption by payment of the taxes due thereon. Subsequent to the dates upon which the period of redemption expired the lots undisposed of at the tax sale or unredeemed by the owner were subject to sale by the state of Michigan at so-called "Scavenger sales," as provided for in Act 155, Public Acts of Michigan, 1937, as amended (Sec. 7.951-7.964, Michigan Statutes Annotated). At these "scavenger sales" the former owner of the lots (including holders of various interests therein) could either bid at the auction or within thirty days after the auction could tender the amount of the highest bid given at the auction and would be declared the purchaser of the lots involved. Petitioner did not redeem any of its lots at the original sale. In the case of 66 of the lots, however, it either purchased them at the "scavenger sale" or acquired them within thirty days thereafter by equaling the highest bid. There are thus two classifications of lots which have given *91 rise to two different tax situations here. Group 1 of the lots consists of 107 lots acquired by the State of Michigan in the enforcement of its lien for delinquent taxes. The statutory period for redemption of these lots expired at various dates from November 3, 1939, to May 4, 1942. Subsequent to the dates upon which the period of redemption expired each lot was sold by the State of Michigan at "scavenger sales" at various dates from February 1940 to February 1943 to purchasers other than petitioner. Group 2 consists of 66 lots. The statutory period of redemption of these lots expired on various dates from November 3, 1939, to May 4, 1942. The "scavenger sales" at which these lots were sold occurred at various dates from February 1940 to February 1943. At said "scavenger sales" petitioner in each instance was either the highest bidder or, within thirty days after the sale matched the highest bid. Twenty-three of these lots had been sold by petitioner prior to November 30, 1944. Based upon the statutory law and facts above outlined, we are presented with two questions: (1) Did the Commissioner err in determining as to the 107 unredeemed lots that the loss of petitioner's investment *92 was properly deductible in the year in which the period of redemption expired? (2) Did the Commissioner err in determining as to the 66 lots which were unredeemed but subsequently either bought or procured from the state, that the basis for gain or loss was the cost to the petitioner at the "scavenger sale"? Petitioner originally reported a net loss in its return for the taxable year November 30, 1944, in the amount of $4,190.88. Respondent determined that certain claimed deductions were unallowable and that certain additions should be made to petitioner's reported taxable income. These revisions by respondent had no connection with the questions at bar and are not at issue herein. When the adjustments were combined, petitioner's gross income was increased in the amount of $13,174.48, leaving petitioner's net income, when unaffected by the adjustments involved in this litigation at $8,983.63. Petitioner concedes the correctness of this last figure prior to giving effect to the items in controversy between the parties. The following is a tabulation of petitioner's income from 1939 to 1944, inclusive, with loss deductions and net operating deductions carried over as contended for *93 by the petitioner: FISCAL YEARS ENDED NOVEMBER 30TH
1939
1940
1941
1942
Net income prior to giv-
ing consideration to
items in controversy
$ 3,350.63
$ 1,241.56
$1,677.89
$7,926.76
Real estate losses
15,897.40
312.33
4,612.29
Adjustments to cost of
sales on lots sold
362.50
2,251.25
3,813.89
Total of additional de-
ductions claimed
$16,259.90
$2,563.58
$8,426.18
Net income without net
operating loss deduc-
tions
$ 3,350.63
($15,018.34)
($ 885.69)
($ 499.42)
Net operating loss carry-
over and deductions
14,931.61
Net income as submitted
by petitioner
($11,580.98)
($15,018.34)
($ 885.69)
($ 499.42)
FISCAL YEARS ENDED NOVEMBER 30TH
1943
1944
Net income prior to giv-
ing consideration to
items in controversy
$ 507.84
$8,983.60
Real estate losses
2,084.10
Adjustments to cost of
sales on lots sold
215.15
742.88
Total of additional de-
ductions claimed
$2,299.25
$ 742.88
Net income without net
operating loss deduc-
tions
($1,791.41)
$8,240.72
Net operating loss carry-
over and deductions
2,290.83
Net income as submitted
by petitioner
($1,791.41)
$5,949.89
*94 The following is a tabulation of petitioner's net income from 1939 to 1944, inclusive, as contended for by the Commissioner: 1939
1940
1941
1942
Net income prior to giv-
ing consideration to
items in controversy
$ 3,350.63
$ 1,241.56
$1,677.89
$7,926.76
Real estate losses
28,763.29
9,518.69
3,500.62
Net income without net
operating loss deduc-
tions
($25,412.66)
$ 1,241.56
($7,840.80)
$4,426.14
Net operating loss carry-
over and deductions
25,412.66
7,840.80
Net income revised ac-
cording to Commission-
er's contention
($25,412.66)
($24,171.10)
($7,840.80)
($3,414.66)
1943
1944
Net income prior to giv-
ing consideration to
items in controversy
$ 507.84
$8,983.60
Real estate losses
Net income without net
operating loss deduc-
tions
$ 507.84
$8,983.60
Net operating loss carry-
over and deductions
3,414.66
Net income revised ac-
cording to Commission-
er's contention
($2,906.82)
$8,983.60
As to the 107 lots included in group 1, which the petitioner did not redeem, purchase at the "scavenger sale," nor procure after the "scavenger sale" from the state, the Commissioner contends *95 that the identifiable event which fixed petitioner's loss was the expiration of his right of redemption after the tax sale and that such losses should be taken in the fiscal years ending November 30, 1939, to November 30, 1942, inclusive. [Opinion] The petitioner contends that the identifiable event fixing its loss was the expiration of its right to procure said lots from the state of Michigan after the "scavenger sales." According to petitioner's contention the losses would be deductible during the taxable years 1940 to 1943, inclusive, and by virtue of the provisions of section 122 (b) (2), I.R.C., it would be entitled to an operating loss carry-over into the taxable year 1944 for a large amount of the losses thus sustained by it. On authority of F.P.E. Noteholders Corporation, 5 T.C. 472, aff'd., 157 Fed. (2d) 982 (C.C.A. 6, 1946), we support petitioner's contention as to its losses sustained in relation to group 1 of the lots involved. In that case the taxpayer procured for $25,000, at a proceeding for reorganization under section 77-B of the National Bankruptcy Act, the bankrupt corporation's right to redeem certain land *96 in Michigan which had been acquired by that state in satisfaction of a lien for delinquent taxes. The taxpayer, however, allowed that right of redemption to expire without exercising it. Thereafter, in the taxable year, the land was offered for sale at a "scavenger sale" under section 7.957 of the Michigan Statutes Annotated. This is the same statutory section involved in the case at bar. The land was purchased by the taxpayer at the "scavenger sale" for $21,464.86. The taxpayer claimed that its basis for gain or loss on the real estate was $46,464.86, being the total it had paid for the right to redeem, plus the amount it had paid for the lots at the "scavenger sale." The Commissioner in said case contended that the amount the taxpayer had paid for the privilege of redeeming had been lost when the lots were not redeemed and that the taxpayer's basis for gain or loss was $21,464.86, the amount paid at the "scavenger sale." This Court upheld the contention of the taxpayer in that case. This holding turned upon whether or not the right of redemption inherent in the original owner and purchased by the taxpayer was a continuing right in the assignee of the original owner and the right *97 existed after the period of redemption had expired up to the time at which said assignee could no longer procure the land at the "scavenger sale." This Court held that such right of redemption was a continuing right until the privilege of procuring the land at the "scavenger sale" had expired. If so, the petitioner herein continued to have some interest in the lots which persisted until the expiration of its right to procure the lots after the "scavenger sale." It did not suffer a total loss of its interest in those lots until that right to procure had expired. In deciding that the taxpayer in the F.P.E. Noteholders Corporation case had such a persisting interest after the expiration of the period of redemption, the Court in that case stated at page 477: "* * * It is clear that the petitioner had such an enforceable legal interest in the land, for, at the time the state acquired 'absolute' title at the end of the redemption period, and for 31 days after the scavenger sale, it had a privilege or a right which it could protect and insist on in its right to purchase by meeting the highest bid at the scavenger sale. * * * A stranger with no previous investment in the property so as to *98 become 'owner' thereof could not have acquired it in the same manner as did the petitioner." It is true as contended by the Commissioner that in the Noteholders case the question before the court was one of determining taxpayer's basis for gain or loss while in the case at bar the question pertains to the date at which the loss was sustained. Nevertheless the legal premise in each case is the same and that premise is essential in each case to the conclusion of the court on the final question involved. Therefore, the prior determination of that premise is conclusive as to the taxable years in which petitioner may properly deduct his losses growing out of the seizure by the state of these lots. The Commissioner also questions the opinion of the Court of Appeals in the F.P.E. Noteholders case because the court in that case stated: "Its findings and conclusion, as set out in its opinion of July 20, 1945, have warrant in the record and a reasonable basis in the law and should therefore be affirmed. Dobson v. Commissioner, 320 U.S. 489." The Commissioner argues that since the case at bar is based upon different facts, the opinion of the Court of Appeals which relies *99 on the Dobson case should not be accepted as authority. We do not accept this reasoning. The question before the court in Noteholders case was purely one of law based upon stipulated facts. If the Commissioner is correct in his premise that the law of the Dobson case applies purely to facts, obviously, its citation by the circuit court in the Noteholders decision on a question of law was extraneous. If the law of the Dobson case applies to both law and fact, then the premise of the Commissioner's argument falls. In any event, the material portion of the opinion of the Court of Appeals of the Sixth Circuit in the Noteholders case which has application to the case at bar is as follows: "The Tax Court ruled correctly that in so acquiring the property the taxpayer had the right to add the $25,000 to the sale price of $21,464.86 in determining the cost to it." The effect of the above statement is that capital expenditures made before the right to redeem at the tax sale had expired should be combined with capital expenditures made at the "scavenger sale" in order to determine the basis for loss and gain. Thus, the owner of the land retained in the land a substantial right, after the *100 expiration of his redemption period, not possessed by others. Therefore, the taxpayer had not suffered a deductible loss during the year in which that privilege of redemption had expired. He sustained his complete loss at the time that he lost all rights in the real estate and that was when his period to acquire the lots after the "scavenger sale" had expired. The second question presented herein is almost identical to the question before the court in the Noteholders case, i.e., whether petitioner's basis for gain or loss shall include capital cost expenditures made prior to the expiration of the period of redemption at the tax sale. This Court held in the Noteholders case that all such prior capital expenditures were includible in the taxpayer's base and on the authority of that case we so hold in the case at bar. Decision will be entered under Rule 50.